UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

JORGE NAVA-PEREZ                                                                    PLAINTIFF

v.                                                                  CIVIL ACTION NO. 3:11-CV-00095

JEFFERSON COUNTY STONE COMPANY                                          DEFENDANT

## MEMORANDUM OPINION

Before the court are several motions. First, Defendant Jefferson County Stone Company d/b/a Rogers Group, Inc., ("JCS") has moved for summary judgment (DN 24). Second, Plaintiff Jorge Nava-Perez has made a motion for leave to file additional proof (DN 26). Third, JCS has made a motion for Rule 37 sanctions (DN 29). Fourth, Nava-Perez has moved to file a sur-reply (DN 33). Fifth, and finally, Nava-Perez has made a motion for oral argument on all pending motions (DN 36). All motions have been fully briefed and are thus ripe for resolution.

## I.

The dispute in this case centers on the allegations by Nava-Perez in his complaint that he was "regularly subjected to racial, ethnic and national origin disparaging remarks, comments, and adverse treatment in performance of [his] duties, and communications with co-employees, which was made known to" JCS; that he was placed in a more physically strenuous position because he was Hispanic; that he suffered multiple injuries due to those strenuous tasks but was always reassigned to those tasks when he returned from medical leave; and that JCS repeatedly canceled his medical appointments.

JCS is a stone quarry operated by the Rogers Group. JCS hired Nava-Perez as an hourly employee in June of 2005. The hourly employees were supervised by the foreman. During Nava-Perez's time at JCS, there were three foremen: Rob Swift, Jim Webb, and Bobby Harmon. Kevin Phillips managed the quarry during most of the time Nava-Perez worked there; as manager, he supervised the foremen.

While working at JCS, Nava-Perez performed various jobs. He was hired as a crusher operator, which involved sitting inside a booth and using the controls to operate the rock crusher and supervise the conveyor belts. The crusher operator job was the easiest job to perform physically.

When Phillips became the manager at JCS, he had Nava-Perez work as a haul truck driver for a few days, before switching Nava-Perez to the belt clean-up, or shoveling, job. The shoveling job entailed shoveling away rock that spilled off the conveyor belts so that it would not accumulate and stop the belts from running. Nava-Perez typically had to perform the belt clean-up job alone. JCS claims that Nava-Perez was assigned to belt clean-up because he was good at it. Two of his former co-workers, Jerry Peterson and Steve Stangle, agreed that Nava-Perez was very good at the job. Peterson testified that Nava-Perez was "probably the best guy" he had "ever seen" at belt clean-up, and "as long as [Nava-Perez] was on the belt line, the belt line stayed running." Stangle stated that Nava-Perez was very good at the job. In fact, Stangle stated, Nava-Perez often worked belt clean-up alone because he was good at it, whereas others could not keep up with the job if they were by themselves.

Nava-Perez was not the only employee that did belt clean-up, though. Stangle explained that everybody had been assigned to work belt clean-up at some point or another. Before Nava-

Perez began belt clean-up, a non-Hispanic Caucasian employee named Harold Ashcraft was often assigned to the job. Nava-Perez acknowledged that he had heard Ashcraft perform the job by himself, but stated that the plant was newer then and did not have as many spills to clean up. Nava-Perez was also aware that two Hispanic employees, Marcellino Guerra and Juan Delgado, had been assigned to belt clean-up, although Guerra told Nava-Perez that he and Delgado worked together to do the job. When Nava-Perez was reassigned to serve as a crusher operator due to an injury, JCS assigned two non-Hispanic Caucasian employees, Trey Williams and John Key, to perform the belt clean-up job.

Besides Nava-Perez, JCS had three other Hispanic employees: Guerra, Delgado, and Jesse Cabada. Cabada primarily worked as a lead man, which, to Nava-Perez's understanding, was similar to the foreman's position, but underneath it. During the time Nava-Perez was working at JCS, Guerra was primarily a drill man, and Delgado primarily operated a water truck that was used to spray dust off the rocks and operated the crusher machine.

On November 18, 2008, Nava-Perez injured his right elbow shoveling. The next day, Phillips went to Nava-Perez's home, picked him up, and took him to a doctor. The doctor issued instructions, including work restrictions, and ordered a follow-up visit on November 25, 2008. Nava-Perez's medical records show that he attended the follow-up appointment, wherein the doctor ordered him to continue with the work restrictions until December 1, 2008, at which point he could return to regular work duty without any restrictions. In accordance with the restrictions, JCS assigned Nava-Perez to work as a crusher operator until December 1; he was then placed back on belt clean-up.

- 3 -

On June 3, 2010, Nava-Perez suffered another injury, this one to his right shoulder. When Nava-Perez reported the injury to JCS, after a three-day weekend that followed his injury, Phillips again brought Nava-Perez to the doctor. The doctor issued work restrictions for Nava-Perez and set a follow-up appointment for June 14, 2010. When Nava-Perez returned to work, he was assigned to be a crusher operator as a result of his injury-related work restrictions. He would remain a crusher operator until he was terminated in December of 2010.

Nava-Perez was apparently unable to attend certain follow-up appointments following his June 3 injury, perhaps including the appointment set for June 14, 2010. Nava-Perez stated in his deposition that when he sought a ride to his appointments during work hours, he was told that only Phillips could take him; if Phillips could not or would not do that, Nava-Perez did not attend the appointments.

On November 4, 2010, Nava-Perez reported to JCS that his June injury was still bothering him. He was again taken to the doctor, who again placed work restrictions on him. However, Nava-Perez was already working as a crusher operator, the least strenuous position available for him. The doctor also set a follow-up appointment for November 12, which Nava-Perez's medical records indicate he attended. At that follow-up, the doctor referred Nava-Perez to an orthopedic surgeon.

Nava-Perez spoke with Mark Newman, a case manager for JCS's worker's compensation insurance provider. Through a misunderstanding with Newman, Nava-Perez believed he was to consult a chiropractor. Accordingly, he set up an appointment with one, Dr. Julia Lyles. Somebody at Liberty Mutual noticed that Nava-Perez had actually been referred to an orthopedic

surgeon. Newman cancelled the appointment with Lyles and told Nava-Perez to find an orthopedic surgeon.

Nava-Perez then located an orthopedic surgeon, Dr. Samuel Carter, and set up an appointment with Dr. Carter for December 10, 2010. At his deposition, Nava-Perez stated that Dr. Carter cancelled the appointment. Nava-Perez's medical records show that he attended the appointment. Nava-Perez also noted during his deposition that one of his appointments with Dr. Carter had been rescheduled.

While Nava-Perez worked at JCS, he was upset by certain comments of his co-workers and supervisors. Nava-Perez stated that an hourly employee named Ron Yoder once got mad at Nava-Perez and called him a "mother fucker Mexican wetback." David Cooper, another hourly employee, told Yoder to "shut up." Nava-Perez did not tell anybody about the incident, although he believed that Swift, the foreman, would have heard the comment over the radio.

On another occasion, Nava-Perez found the word "joto," which is Spanish for "homosexual," written on a metal beam. Nava-Perez was unsure who had written the word on the beam, but because he was the only one who worked in that area, he believed it was directed at him. Nava-Perez recalled reporting the incident to Phillips, but could not recall Phillips following up on the report. Nava-Perez was also unsure whether he took any additional steps after reporting the incident to Phillips.

Nava-Perez also alleged that Webb, a foreman, "always called [Nava-Perez] names." Nava-Perez recalled that Webb had once called Nava-Perez "senorita." Another employee told Phillips that Webb did so. Phillips spoke to Webb, who explained that he was "joking around," but Nava-Perez got upset. Phillips talked to Webb about the ethics policy and warned him about

how to communicate with other employees, especially since Webb was a supervisor. Phillips also attempted to speak to Nava-Perez about the incident, but Nava-Perez declined to discuss it and stated that he did not want to get anybody in trouble. The only other comment from Webb that Nava-Perez could remember came after Nava-Perez reported to Webb that Webb needed to fix a conveyor belt. Webb responded that Nava-Perez"cr[ied] like Scott." Scott was a Caucasian employee who apparently complained often.

Another time, an hourly employee named Harold Ashcraft stated, in a conversation with Nava-Perez and others over the radio, that "Mexicans are dirty." The conversation was in regard to Ashcraft's neighbor, Roberto, who was not Mexican but Guatemalan, and who Ashcraft said had "animals under his house." Nava-Perez also once overheard Cooper tell Ashcraft over the radio that he was taking his children to Trick or Treat in "little Mexico" in LaGrange. In addition, Nava-Perez was insulted when a Hispanic co-worker called him "chamar," which means "witch doctor" in Spanish.

Beyond those comments, Nava-Perez apparently was offended by a litany of other actions and comments from his co-workers and supervisors. For instance, Nava-Perez claims that Harmon, a forman, had laughed at Nava-Perez twice, but Nava-Perez did not know why. Harmon had also engaged in dangerous actions on the worksite, such as driving a truck without brakes and opening the door of the crusher machine while it was turned on. Harmon once called Nava-Perez "stupid" when Nava-Perez had trouble with the crusher machine. Nava-Perez was also upset about a co-worker that had expressed a desire to fight him, although Nava-Perez was unsure why the co-worker wanted to do so. However, while Nava-Perez was concerned about these and many other happenings at JCS, the parties have not pointed the court to any evidence

that would indicate that these actions or comments were based in any way on Nava-Perez's race or ethnicity.

In December 2010, Nava-Perez was laid off from JCS. Nava-Perez only knew of two other persons laid off at that time, although the Rogers Group actually terminated 11 employees between JCS and another work location. According to JCS, Nava-Perez was laid off because he could only operate the crusher machine due to his injuries and he was deficient at doing that.

## II.

In a complaint filed in Jefferson County, Kentucky, Circuit Court, Nava-Perez alleged that JCS violated the Kentucky Civil Rights Act by discriminating against him on the basis of his race, ethnicity, and national origin. JCS removed the case to this court based on diversity jurisdiction. In a scheduling order entered on April 4, 2011, Magistrate Judge Dave Whalin set deadlines of June 30, 2011 for plaintiff to disclose experts to defendant and July 29, 2011 for defendant to disclose experts to the plaintiff. A later order of the Magistrate Judge set December 15, 2011 as the deadline for completing discovery.

On February 17, 2012, JCS moved for summary judgment. On March 8, 2012, Nava-Perez moved for a 45-day extension of time to file a response to JCS's summary judgment motion. That same day, Nava-Perez filed a separate motion for leave to file additional proof. He sought leave to introduce three pieces of evidence: (1) a medical report by Dr. Joseph Kutz that was completed on March 2, 2012; (2) an affidavit made by Cabada; and (3) various certified medical records that Nava-Perez had recently received from JCS.

JCS filed papers in response to Nava-Perez's motion. JCS requested that the court grant Nava-Perez only seven to 14 days to file his response to the summary judgment motion. JCS also

requested that Nava-Perez's motion for leave to file additional proof be denied on the basis that Dr. Kutz's medical report and the Cabada affidavit were untimely. Finally, JCS sought sanctions under Federal Rule of Civil Procedure 37 for Nava-Perez's alleged untimely disclosure of Dr. Kutz's medical report and the Cabada affidavit.

In Nava-Perez's reply papers in support of his motions and response to JCS's request for sanctions, Nava-Perez explained that Dr. Kutz's report was not disclosed earlier because it had only recently been completed after Nava-Perez sought an opinion in late January 2012 regarding his ongoing injuries. Nava-Perez also explained that the Cabada affidavit was not disclosed earlier because of a mistake by his attorney. JCS filed a reply in support of its motion for Rule 37 sanctions, arguing that Nava-Perez's explanations were insufficient to avoid sanctions.

Nava-Perez then moved to file a sur-reply to JCS's reply. JCS filed papers opposing that motion. Next, on April 19, 2012, Nava-Perez moved for oral argument on all pending motions, which JCS opposed on the basis that the paper filings were sufficient for this court to resolve the outstanding motions.

On April 23, 2012, Nava-Perez filed a renewed motion for an extension of time to file a respone to JCS's summary judgment motion. Nava-Perez sought an additional three weeks to file a response. The court granted that motion on May 11, 2012, providing Nava-Perez 21 days from that date to file his response.

On June 1, 2012, Nava-Perez filed a document he deemed a supplemental response to the defendant's motions and notice of filing of report of Dr. Joseph Kutz. That document explained that Dr. Kutz had updated his medical report and Nava-Perez wished to file a new copy under seal. Otherwise, the supplemental response reiterated the reasons for Nava-Perez's failure to

disclose the medical report and Cabada affidavit earlier than when he did; the supplemental response also renewed Nava-Perez's request for oral argument. However, the supplemental response did not address any arguments made in JCS's summary judgment motion. On June 22, 2012, Nava-Perez filed a complete copy of Nava-Perez's deposition, but again failed to provide this court with any argument as to why JCS's summary judgment motion should fail. Nor did Nava-Perez provide citations to any portions of the record that would contradict the facts outlined in JCS's summary judgment motion.

Meanwhile, on June 12, 2012, JCS filed a reply in support of its motion for summary judgment. The reply papers briefly restated JCS's position that it was entitled to summary judgment on the merits of Nava-Perez's discrimination claims, and also pointed out Nava-Perez's complete failure to address the merits in his supplemental response.

### III.

### A.

The court begins with the motion for summary judgment.[1] To prevail on a motion for summary judgment, the movant must show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine issue of material fact arises when there is sufficient evidence on which the jury could reasonably find for the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1985).

---

[1] As detailed above, Nava-Perez twice moved for an extension of time to file a response to JCS's motion for summary judgment. The court granted the second of those motions, providing Nava-Perez an additional 21 days from the date of that order. Nava-Perez ultimately had more than three months to provide a response to the summary judgment motion. However, none of his filings in this court have addressed JCS's arguments for summary judgment, be it on the law or on the facts. He has also not moved for any further extensions of time and the time provided in the court's order granting his second request for an extension of time has long passed.

The disputed issue does not need to be resolved conclusively in favor of the non-moving party, but that party must present sufficient probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial. *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-289 (1968). The evidence must be construed in the light most favorable to the non-moving party. *Summers v. Leis*, 368 F.3d 881, 885 (6th Cir. 2004).

B.

In Nava-Perez's complaint, he claims that JCS violated the Kentucky Civil Rights Act. Because the Kentucky Act mirrors the language of Title VII of the Civil Rights Act of 1964 ("Title VII"), the federal standards for evaluating race discrimination claims are applicable to claims under the Kentucky Act. *Smith v. Leggett Wire Co.*, 220 F.3d 752, 758 (6th Cir. 2000); *Ammerman v. Bd. of Educ. of Nicholas County*, 30 S.W.3d 793, 797-798 (Ky. 2000).

Nava-Perez alleges in his complaint that he was "regularly subjected to racial, ethnic and national origin disparaging remarks, comments, and adverse treatment in performance of [his] duties, and communications with co-employees, which was made known to" JCS. Nava-Perez also alleged that he was placed on more strenuous tasks because he was Hispanic, that he suffered multiple injuries due to those strenuous tasks but was always reassigned to those tasks when he returned from medical leave, and that JCS repeatedly canceled his medical appointments.[2] Nava-Perez's claims of discrimination thus fall into two categories: (1) that he

---

[2] The last of those claims–that JCS canceled Nava-Perez's medical appointments because of discrimination based on his race– has no factual basis. Nava-Perez's deposition testimony made clear that Newman, the case manager for JCS's worker's compensation insurance provider, canceled an appointment with a chiropractor because Nava-Perez needed to see an orthopedic surgeon, consistent with Nava-Perez's doctor's referral. Nava-Perez also stated at his deposition testimony that one of his appointments with Dr. Carter, the surgeon, had been canceled and/or rescheduled by the doctor's office. Neither of those cancellations were done at JCS's request, and there is no

continue...

was subjected to a hostile work environment; and (2) that he was subject to adverse employment conditions as a result of his race, ethnicity, or national origin. The two categories will be dealt with respectively.

C.

To make out a claim for hostile work environment, a plaintiff must show: "(1) [he] was a member of a protected class; (2) [he] was subjected to unwelcomed harassment; (3) the harassment was based on [his protected status]; (4) the harassment created a hostile work environment; and (5) employer liability." *Ladd v. Grand Trunk W. R.R., Inc.*, 552 F.3d 495, 500 (6th Cir. 2009). Here, JCS argues that Nava-Perez cannot satisfy the fourth and fifth elements of that cause of action.

In determining whether a plaintiff was subjected to harassment that created a hostile work environment, the only harassment that may be considered is harassment based on the plaintiff's protected status. *Williams v. CSX Transp. Co., Inc.*, 643 F.3d 502, 511 (6th Cir. 2011). Thus, the court must first determine what harassment Nava-Perez faced that was premised on his race, ethnicity, or national origin. *Id.* Then, the court must examine "whether the totality of that harassment was sufficiently severe or pervasive to create a jury question on [Nava-Perez's] claim." *Id.*

---

[2]...continue

evidence of any connection between the cancellations and Nava-Perez's race. Finally, Nava-Perez claimed that on one or more occasions, he could not make his doctor's appointments because Phillips was not around to take him to the appointments. However, there is no showing that JCS was required to bring Nava-Perez to his doctor's appointments; that he could not get there without Phillips simply does not constitute cancellation of the appointments, much less has Nava-Perez made any showing that there was a cancellation due to his race. Accordingly, summary judgment is appropriate on that claim.

"A plaintiff may prove that harassment was based on race [or another protected status] by either (1) direct evidence of the use of race-specific and derogatory terms or (2) comparative evidence about how the alleged harasser treated members of both races in a mixed-race workplace." *Williams*, 643 F.3d at 511 (citing *Oncale v. Sundower Offshore Servs., Inc.*, 523 U.S. 75, 80-81 (1998)). Conduct that is not explicitly race-based may still be illegally race-based if it can be shown that an employee would not have been subjected to harassment but for the employee's status as a member of a protected class. *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 706 (6th Cir. 2007).

JCS argues that there is only one action taken by or comment made by any of its employees that was premised on Nava-Perez's race: Ron Yoder's statement that Nava-Perez was a "mother fucker Mexican wetback." Beyond that statement, JCS contends that none of the other conduct to which Nava-Perez pointed in his deposition or complaint constituted harassment based on Nava-Perez's race.

JCS takes the position that Ashcraft's statement that "Mexicans are dirty" was not a derogatory comment directed at Nava-Perez because Nava-Perez acknowledged that Ashcraft was talking about his Guatemalan neighbor, Roberto, at the time he made the statement. Despite JCS's argument concerning Ashcraft's comment that "Mexicans are dirty" was not harassment because it was not explicitly directed at Nava-Perez, a reasonable jury could easily find that such an explicit statement made over a radio in a conversation in which a Mexican, Nava-Perez, was participating constituted harassing conduct.

JCS further argues that when Webb called Nava-Perez "senorita" and somebody wrote "joto" on a metal beam, Nava-Perez was not being harassed based on his race, but based on other

- 12 -

qualities unrelated to his Hispanic status. In JCS's view, the words used to insult Nava-Perez were simply in the Spanish language, but were not in and of themselves slanderous of Hispanics. However, the court is not willing to dismiss out of hand the possibility that the insults directed at Nava-Perez in Spanish were motivated by some sort of animus toward Hispanics. For instance, even though calling Nava-Perez a lady would not appear to be race-based harassment, Webb chose to use the Spanish term "senorita" to render that insult. It would not be unreasonable for a jury to find that Webb's choice to use the Spanish term was meant to be derogatory toward Nava-Perez's race. Likewise, the use of the word "joto" could reasonably be interpreted as being derogatory toward Nava-Perez both for qualities unrelated to race and for being Hispanic.

On the other hand, the court agrees with JCS that the use of the word "chamar" by a Hispanic co-worker to insult Nava-Perez does not appear to be harassment based on race. Unlike Webb's use of the word "senorita," the choice of the word "chamar" appears to be based on nothing more than that the speaker and Nava-Perez shared the Spanish language. In that instance, the fact that a Spanish word was used instead of an English one loses its import as a potential derogatory term.

Lastly, JCS states that Cooper's use of the term "little Mexico" to describe the area in LaGrange where Cooper was taking his children to trick or treat was not harassment because it was no different from describing an area populated by Italians as "Little Italy." A jury would be entirely reasonable in concluding that Cooper was simply describing a geographic area inhabited by many persons of Mexican descent, and thus that the statement was not race-based harassment. However, the court will give Nava-Perez the benefit of the doubt and accept that he was

offended by Cooper's decision to use the ethnic background of community inhabitants to identify that area.

Aside from the statements discussed above, there is no evidence that any other action taken by any employee or supervisor at JCS was premised on Nava-Perez's race. For instance, while Nava-Perez bemoans that he was placed on belt clean-up, a physically demanding job, there is no indication that he was put there for any reason other than his ability to perform the job well. No comments were ever made to him that he was assigned to belt clean-up because he was Hispanic. Nor is the comparative evidence about how Hispanics and non-Hispanics were assigned jobs sufficient to show that Nava-Perez was assigned to belt clean-up due to his race. Non-Hispanics were sometimes assigned to belt clean-up; indeed, both before and after the time period when Nava-Perez was assigned to belt clean-up, non-Hispanic men were assigned to do that job. And while Nava-Perez complains that he was assigned to do belt clean-up alone, the evidence shows that it was because he could usually do it by himself. In fact, two of his Hispanic co-workers stated that when they had been asked to do belt clean-up in the past, they did it as part of two-man teams. In short, the evidence does not support the conclusion that Nava-Perez was assigned to belt clean-up, or that he was assigned to that job alone, because he was Hispanic. Nor is there any evidence that any of the other actions or comments about which Nava-Perez has complained were based on his race. Thus, only the comments described above will be considered in assessing Nava-Perez's hostile work environment claim.

Conduct will give rise to a hostile work environment if it is "sufficiently severe or pervasive [so as] to alter the conditions of the victim's employment and create an abusive working environment." *Williams*, 187 F.3d at 560 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S.

17, 21 (1993)). In assessing that standard, courts must look at the totality of the circumstances. *Id.* at 562. Courts must look at such factors as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23. "Simple teasing, offhand comments, and isolated comments (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). Instead, "conduct must be extreme to amount to a change in the terms and conditions of employment." *Id.*

Taken together, the comments detailed above do not rise to the level of constituting a hostile work environment. The racial epithet used by Yoder was clearly offensive. However, there is no evidence that Yoder touched Nava-Perez in any manner or otherwise physically threatened him. Indeed, another employee quickly stood up for Nava-Perez and told Yoder to "shut up," at which point the confrontation ended. Nava-Perez did not even report Yoder's comment to his supervisors or the AlertLine. Additionally, Yoder was merely an hourly employee, not a supervisor. There is also no evidence that Yoder's comment unreasonably kept Nava-Perez from performing his work.

Beyond Yoder's epithet, the other comments detailed above are, at most "offensive utterance[s]." For instance, Ashcraft's statement that "Mexicans are dirty" expressed a disdainful judgment that well deserves condemnation. But Ashcraft was not a supervisor, the statement was not physically threatening, the statement was not the sort of severe epithet used by Yoder, and there is no evidence that the statement unreasonably interfered with Nava-Perez's work.

Likewise, it appears that the use of Spanish words such as "senorita" and "joto" to tease Nava-Perez were just that: unwanted teasing. And, although, as the court found above, it is possible to view Nava-Perez's race as playing some part in that teasing by the choice of the teasers to use Spanish words, it is just as true that the main emphasis of the teasing was for qualities other than Nava-Perez's Hispanic status. Moreover, as with Ashcraft's statement, there is no evidence that the teasing via Spanish words was physically threatening or that it interfered with Nava-Perez's work.

Cooper's comment about "little Mexico" appeared to be nothing more than an offhand comment, and was not directed at Nava-Perez. Even assuming that Nava-Perez felt it was offensive, it is also true that as an objective matter the offense level of the statement is small. There is nothing perjorative about the statement; rather it appeared to be nothing more than Cooper's descriptive term for a geographic area.

Those five comments–Yoder's epithet, "senorita," "joto," "Mexicans are dirty," and "little Mexico"–were made during a five and a half year period when Nava-Perez worked at JCS. Only one of the comments was made by a supervisor and none of them communicated any physical threats. Taking all five of those comments together, this court finds they are insufficient to have changed the terms and conditions of Nava-Perez's employment. Thus, JCS is entitled to summary judgment on Nava-Perez's hostile work environment claim.[3]

---

[3] Because the court finds that Nava-Perez was not subjected to a hostile work environment, it will not address JCS's argument that it is not liable due to its No-Harassment Policy and responses to reports of harassment.

D.

Turning to Nava-Perez's adverse treatment claim, there is no direct evidence that he was assigned to belt clean-up due to racial discrimination. Because he would be required to establish that claim with circumstantial evidence, the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) would apply. Nava-Perez would first be required to establish a *prima facie* case of discrimination. *Russell v. Univ. of Toledo*, 537 F.3d 596, 604 (6th Cir. 2008). To do so, he would have to show that he: (1) is a member of a protected group, (2) was subject to an adverse employment decision, (3) was qualified for the position, and (4) was replaced by a person outside the protected class or was treated differently than similarly situated non-protected employees. *Id.* (quoting *Carter v. Univ. of Toledo*, 349 F.3d 269, 273 (6th Cir. 2003)). If a plaintiff establishes a *prima facie* case, the burden shifts to the defendant to articulate a legitimate and nondiscriminatory reason for the adverse employment decision. *Id.* The burden would then shift back to the plaintiff to show that the proffered reason was a pretext. *Id.* JCS contends that Nava-Perez cannot meet the second or fourth elements of a *prima facie* case, nor can Nava-Perez show pretext.

The supposedly adverse employment action that Nava-Perez claims, in his complaint, he was subjected to was his assignment to belt clean-up. That job, he notes, was more physically strenuous than other jobs. Indeed, Nava-Perez injured himself while performing that job. JCS, citing *Hopkins v. Electrict Data Systems Corporation*, 196 F.3d 655, 662 (6th Cir 1999), argues that assigning Nava-Perez to belt clean-up was not an adverse employment action because Nava-Perez suffered no reduction in pay or differences in work hours.

- 17 -

The court agrees that the record does not demonstrate that Nava-Perez suffered a materially adverse employment action when he was assigned to work primarily doing belt clean-up. In *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876(6th Cir. 1996), the Sixth Circuit listed several factors to consider in determining whether an employment action was materially adverse: "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Kocsis*, 97 F.3d at 886 (quoting *Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993)). Almost all of those factors are plainly missing here: Nava-Perez was not terminated, there is no evidence his pay was decreased or that he lost benefits, he did not lose a title, and, although his responsibilities changed with his position, they were not "significantly diminished."

As far as this court can tell, the most significant aspect of Nava-Perez's change to belt clean-up was that the work was more physically strenuous. But, while that may be true, this court is not convinced that a change in the amount of physical labor required of Nava-Perez constituted an adverse employment action.

First, Nava-Perez was working at a stone quarry, not an office job where he may reasonably have expected not to engage in physically demanding work. According to his former co-worker, Jerry Peterson, there were not any jobs at the quarry that were not physical. As an example, he stated that driving a truck at the quarry was "like driving a car, except that it'll beat the–heck out of you all day long. So when you're done at the end of the day, you feel like you were in a wrestling match all day. Bumpy roads, getting loaded, it rocks the truck." Another job included drilling into a rock wall. According to Peterson, even the crusher operator–the least

strenuous position at the quarry–still had to make sure that the plant operated smoothly, which could require shoveling rocks off the conveyor belts when they were overloaded or performing maintenance on the broken conveyor belts. Further, it appears that many, although not all, employees at JCS were required to engage in many different jobs at different times. Nava-Perez himself drove a truck when the belt was cleaned up; alternatively, others were occasionally assigned to assist Nava-Perez with belt clean-up if he needed help for an hour.[4]

In short, without more, Nava-Perez's assignment to a physically strenuous job at a stone quarry was not enough to constitute a materially adverse employment decision. Accordingly, Nava-Perez cannot demonstrate a *prima facie* case of adverse treatment.[5]

## IV.

Turning to the remaining motions, the court will grant in part and deny in part Nava-Perez's motion to file additional proof, and will grant in part and deny in part JCS's motion for sanctions. Specifically, the court will accept the medical report of Dr. Kutz, but will not allow Nava-Perez to submit the Cabada affidavit. The court will decline to order any additional sanctions as to the failure to earlier disclose the Cabada affidavit beyond barring Nava-Perez from using that affidavit to supply evidence in response to JCS's summary judgment motion.

---

[4] Nava-Perez also complains that once he was injured, he was reassigned to belt clean-up. Contrary to Nava-Perez's contention in his complaint, the undisputed evidence shows that when Nava-Perez was hurt and had physical restrictions, JCS abided those restrictions. When Nava-Perez was injured the first time at JCS, on November 18, 2008, he was assigned to be a crusher operator until he recovered and the restrictions expired. After the second time Nava-Perez was injured at JCS, on June 3, 2010, JCS again reassigned him to be a crusher operator, where he remained for the duration of his time at JCS.

[5] Having concluded that Nava-Perez did not suffer an adverse employment decision, the court will not reach JCS's alternative arguments that Nava-Perez could not show any connection between his assignment to belt clean-up and his race or that he could not show that JCS's legitimate, nondiscriminatory reason for placing him on belt clean-up was a pretext.

The court will also grant Nava-Perez's motion to file a sur-reply. However, the court will deny Nava-Perez's motion for oral argument, as the issues have been fully briefed for this court and this court sees no issues upon which oral argument will be any more illuminating than the written briefing has been.

A.

Federal Rule of Civil Procedure 26(a)(1)(A)(i) requires that parties must, without awaiting a discovery request, provide other parties with identification information for potential witnesses that the disclosing party may use to support its claims, along with the subjects of that information. Subsection (ii) of Rule 26(a)(1)(A) requires that parties similarly provide copies of documents that the disclosing party has in its possession and that it may use to support its claims. Rule 26(e)(1)(A) provides that parties are under a duty to supplement disclosures made under Rule 26(a) in a timely manner upon realizing that the disclosure was incomplete or incorrect. And Rule 37(c)(1) provides, "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." The burden is on the potentially sanctioned party to prove justification or harmlessness. *R.C. Olmstead, Inc. v. CU Interfact, LLC*, 606 F.3d 262, 272 (6th Cir. 2010). Rule 37(c) further allows that, "[i]n addition to or instead of this sanction," the court "may order payment of the reasonable expenses, including attorney's fees, caused by the failure." FED. R. CIV. P. 37(c)(1)(A).

B.

As to the Cabada affidavit, Nava-Perez explains that he met with Cabada on December 23, 2011. According to counsel, Cabada was reluctant to speak with counsel prior to that time for fear of reprisal from JCS. While that may be a reasonable explanation for why Nava-Perez did not provide notice that Cabada would be a witness for him or disclose his affidavit prior to December 23, Nava-Perez has not put forth a reasonable explanation for thereafter failing to disclose that information in a timely manner.

It was not until March 8, 2012 that Nava-Perez disclosed Cabada's affidavit to JCS. Nava-Perez's attorney, John Frith Stewart, explains the two and one-half month delay thusly: after meeting with Cabada and obtaining the affidavit on December 23, Stewart placed the written statement in a file folder. At that time, it was after the close of business hours, and Stewart was off the next two days for Christmas Eve and Christmas. Then, on December 26, Stewart left town to go to Alabama to assist a friend in moving into a new home. Thereafter, Stewart returned to Kentucky and to work. However, busy with a heavy workload and problems in his family, Stewart forgot that he had spoken to Cabada and never sent the affidavit to JCS's attorneys. Stewart acknowledged that he failed to place the task of forwarding the affidavit on his task list or calendar, as was his usual practice. Stewart states that upon receiving JCS's motion for summary judgment, he realized his error in failing to disclose the Cabada affidavit. Stewart states that he apologizes to the court and to JCS's attorney for his failure to timely disclose the Cabada affidavit.

However, while the court does not doubt that Stewart's failure to timely disclose the Cabada affidavit was due to inadvertence rather than some sort of strategic ploy on his part, that

is an insufficient rationale for the delay in disclosure. Rule 37(c)(1) mandates that a party is not allowed to use information or a witness to supply evidence on a motion when the party failed to make the required disclosure of that information or witness, unless the failure was "substantially justified or is harmless." Here, Nava-Perez cannot meet his burden of showing that his failure to earlier disclose the Cabada affidavit was "substantially justified."

Additionally, the late disclosure could hardly be called "harmless." On February 17, 2012, nearly two months after Nava-Perez received Cabada's affidavit and the close of discovery, JCS moved for summary judgment. It was not until over two weeks after JCS filed that motion that it first learned about Cabada's affidavit, and there is no indication that JCS had any inkling that Cabada was going to be a witness in the case. The affidavit itself is 13 pages long and takes the form of typewritten notes, rather than numbered paragraphs, although Cabada signed it, affirming that the statements within it were true and correct and made by him, and it was notarized. JCS states that if the Cabada affidavit were to be admitted, JCS would need to depose Cabada, potentially meet with other witnesses, and then address the new evidence in briefing before the court. Those concerns are legitimate. Indeed, one purpose of the discovery and scheduling provisions of the Federal Rules of Civil Procedure is to avoid this type of situation, where a party believes it has completed all relevant discovery and is ready to file a dispositive summary judgment motion, only to find itself surprised with the need to reassess its position and conduct additional discovery.

Because the court finds that Nava-Perez's untimely disclosure of the Cabada affidavit was neither "substantially justified" nor "harmless," Rule 37(c) commands this court to impose sanctions. Typically, the appropriate sanction is to disallow the use of the improperly disclosed

evidence on a motion, at a hearing, or at a trial, although the rule provides that other sanctions, such as the payment of reasonable expenses caused by the improper disclosure, are permissible in addition to or in lieu of the preclusion of the evidence. *See* FED. R. CIV. P. 37(c). Here, the court finds it is sufficient and appropriate to disallow Nava-Perez from using the Cabada affidavit to fight JCS's summary judgment motion. The court will decline to impose any further sanction, such as the payment of expenses.

C.

With respect to the medical report from Dr. Kutz, Nava-Perez explains that Dr. Carter stopped seeing him in December 2011, and thereafter, on January 31, 2011, Nava-Perez sought an opinion from Dr. Kutz about his ongoing injury. The report by Dr. Kutz was created on March 2, 2012, after Dr. Kutz examined Nava-Perez. JCS argues that the Dr. Kutz report is an attempt by Nava-Perez to have Dr. Kutz act as an expert witness for Nava-Perez, despite that the report was not disclosed until nine months after the deadline for disclosing expert witnesses. Nava-Perez disputes that notion. He explains that he is only seeking to submit the report as a recent medical record, not to have Dr. Kutz act as an expert.

JCS's argument that the Dr. Kutz report is an attempt to circumvent the expert disclosure requirements is not without basis. The report is a two-page letter addressed to Nava-Perez's attorney that provides a medical and personal history of Nava-Perez. It thus does not take the form of a typical medical record.

However, the report also has indications that Nava-Perez sought Dr. Kutz out not to act as an expert witness, but to provide him with medical services for ongoing issues. The report provides an explanation of the examination's findings and recommendations for Nava-Perez's

treatment going forward. It concludes with the doctor's statement, "Hope this report provides some clarification concerning Mr. Nava-Perez's medical condition," which could be read to indicate that Nava-Perez saw the doctor to assess his medical condition going forward, rather than to prepare for litigation.

The court will accept the representation of Nava-Perez's attorney in his papers that Dr. Kutz will not be a medical expert for Nava-Perez, but instead was simply acting as Nava-Perez's medical care provider. Accordingly, the fact that Nava-Perez did not disclose Dr. Kutz as an expert by the deadline for expert disclosures is irrelevant. Additionally, because the report was created as a result of Nava-Perez's ongoing medical care and was disclosed to JCS shortly after it was created, the court finds that the disclosure comported with Nava-Perez's ongoing duty to supplement discovery.

Nevertheless, the report does nothing to cause this court to reconsider its decision to grant JCS's motion for summary judgment. The grounds for granting summary judgment were that Nava-Perez did not point to sufficient evidence for a reasonable jury to conclude that he faced a hostile work environment or that he suffered an adverse employment decision. The medical report has nothing to do with those issues. Accordingly, even though the court finds that Nava-Perez's disclosure of Dr. Kutz's report was not untimely, the court will still grant summary judgment to JCS and dismiss Nava-Perez's claims with prejudice.[6]

---

[6] In Nava-Perez's motion to file additional proof, he also asked to submit various certified medical records that had recently been supplied to him by JCS. JCS states that it was Nava-Perez's fault that he did not get the documents sooner, pointing to Nava-Perez's refusal to sign HIPAA release forms unless they were amended. However, setting aside the matter of who was at fault for Nava-Perez not receiving the documents sooner, the court sees no reason to disallow Nava-Perez from relying on those documents for proof, inasmuch as there is no allegation by JCS that it did not have adequate time to properly investigate the contents of those documents. But even though the
continue...

**V.**

In sum, the court will accept Nava-Perez's sur-reply, but will decline to hold oral argument in this case. Nava-Perez's motion for leave to file additional proof will be granted in part and denied in part, as will JCS's corresponding motion for sanctions. Finally, the court will grant JCS's motion for summary judgment and dismiss Nava-Perez's claims with prejudice.

A separate order will be entered in accordance with this opinion.

September 14, 2012

**Charles R. Simpson III, Judge**
**United States District Court**

D03

---

[6]...continue
court would accept those documents as evidence on the summary judgment motion, Nava-Perez has not actually provided them to the court at any point. Nor has he explained how those medical records would be relevant to the issues raised in the summary judgment motion. The court doubts that the medical records would have anything to say about whether Nava-Perez faced a hostile work environment or suffered an adverse employment decision due to his race.

- 25 -